## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MICHAEL D. WITTMER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. CIV-18-403-SPS** |
| | ) | |
| **ROGER THOMASON, Individually** | ) | |
| **and in his capacity as Mayor and a** | ) | |
| **Trustee of the Board of Trustees of** | ) | |
| **Warner, Oklahoma;** | ) | |
| **BARBARA WATSON, Individually** | ) | |
| **and in her capacity as Trustee of the** | ) | |
| **Board of Trustees of Warner,** | ) | |
| **Oklahoma; JACQUIE MARSHALL,** | ) | |
| **Individually and in her capacity as** | ) | |
| **Trustee of the Board of Trustees of** | ) | |
| **Warner, Oklahoma; CARYN** | ) | |
| **MILLER, Individually and in her** | ) | |
| **capacity as Trustee of the Board of** | ) | |
| **Trustees of Warner, Oklahoma;** | ) | |
| **JOHNNY LEWIS, Individually and in** | ) | |
| **his capacity as Town Clerk-Treasurer** | ) | |
| **and/or Town Administrator of** | ) | |
| **Warner, Oklahoma;** | ) | |
| **TOWN OF WARNER, OKLAHOMA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

This matter comes before the Court on motion for summary judgment by the

Defendants in this case, Roger Thomason, Individually and in his capacity as Mayor and a

Trustee of the Board of Trustees of Warner, Oklahoma; Barbara Watson, Individually and

in her capacity as a Trustee of the Board of Trustees of Warner, Oklahoma; Jacquie

Marshall, Individually and in her capacity as a Trustee of the Board of Trustees of Warner, Oklahoma; Caryn Miller, Individually and in her capacity as a Trustee of the Board of Trustees of Warner, Oklahoma; Johnny Lewis, Individually and in his capacity as Town Clerk-Treasurer and/or Town Administrator of Warner, Oklahoma; and the Town of Warner, Oklahoma ("Town"). For the reasons set forth below, the Court finds that the Defendants' Joint Motion for Summary Judgment and Brief in Support [Docket No. 98] should be GRANTED IN PART and DENIED IN PART.

## PROCEDURAL HISTORY

The Plaintiff filed this case on December 20, 2018. In his Amended Complaint, Plaintiff alleges four causes of action against the various Defendants. The Plaintiff's First Claim for Relief is raised pursuant to 42 U.S.C. § 1983 as to all Defendants, alleging a First Amendment retaliation claim. The Second Claim for Relief is brought under Title VII, alleging a claim for retaliation for engaging in a protected activity as to the Board of Trustees and the Town of Warner. The Third Claim for Relief alleges tortious interference pursuant to Oklahoma law as to Defendant Lewis alone. The Fourth and final Claim for Relief alleges a violation of Oklahoma public policy as a result of wrongful discharge, a *Burk* tort, as to all Defendants.

## LAW APPLICABLE

Summary judgment should be granted if the record shows that "there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

-2-

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the burden of showing the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and the evidence is to be taken in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). However, an adverse party must "properly support an assertion of fact or . . . properly address another party's assertion of fact as required by Rule 56(c)" by "citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute[.]" Fed. R. Civ. P. 56(c).

## FACTUAL BACKGROUND

The relevant undisputed facts in this case reflect that the Plaintiff was hired by the Town of Warner in 2011 as an at-will employee in the Street Department and to provide occasional help in the Water Department. *See* Docket No. 98, p. 7. In 2016, the Plaintiff applied for a new position, but the position went to a co-worker, Joe Swimmer, instead. Upon the announcement of Mr. Swimmer's hiring at a Town meeting, the Plaintiff stood up and called them "sorry pieces of s%$&." *Id.*, Ex. 1, pp. 22-23. In 2017, the Plaintiff was told at a Town meeting to take any issues to the Administrator, and not individual Board members. He was also told by Board Member Sarah Hubler,[1] a personal friend of the Plaintiff, that he needed to follow the chain of command. *Id.*, Ex. 1, pp. 27-29. That same year, the Plaintiff began using his cell phone to make undisclosed recordings of his interactions with co-workers because he feared he was about to lose his job.

---

[1] Ms. Hubler was originally named as an additional Defendant in this case but has since been dismissed. See Docket Nos. 2, 84.

On January 8, 2018, the Plaintiff used his phone to record a conversation between two of his co-workers, Joe Swimmer and Matt McLean, while they were having breakfast at City Hall before the workday began. This recording captured audio of these two employees using racially derogatory language and expressions. *See* Docket No. 107, Ex. 6. Upon recording this conversation, the Plaintiff did not report it to his supervisor (who was also the Town Administrator), Defendant Lewis, but instead released it to local media. The Plaintiff has testified that he heard Mr. Swimmer use racist language on four occasions prior to the one he recorded, but that the recording from January 8, 2018 was the first time he had heard Mr. McLean use racist language. *See* Docket No. 98, Ex. 1, p. 5-7. Upon the release of the recording to the media, both Swimmer and McLean tendered their resignations at a Town special meeting on January 10, 2018. *See* Docket No. 98, p. 9.

The Plaintiff has testified that he believed that he would be terminated for reporting incidences of racist language, but that he knew of no occasion when the Board had fired an employee for making such a report. *Id.*, Ex. 1, p. 3-5. The Town of Warner hired attorney Tom Wright to investigate the claims of racism raised by the Plaintiff's release of the recording to the media. Mr. Wright interviewed the Plaintiff with the Plaintiff's attorney present, and the Plaintiff stated he had not disclosed prior instances of the use of racist language by co-workers to the Board but that he had heard Mr. Swimmer use such language in the past and had told individual Board members. Mr. Wright presented his investigation report at a Town of Warner meeting on March 19, 2018, in which he concluded that the events recorded on January 8, 2018, were an "isolated event," and that the Plaintiff made the recordings not to reveal racism but because he believed Mr. Swimmer was receiving

special treatment.  *See* Docket No. 107, Ex. 2, pp. 4-5.  Mr. Wright further concluded that the Town of Warner acted appropriately in response to this incident by convening a special meeting as soon as was possible, condemning the racial slurs, and calling for an investigation, but that the conversation including racial slurs was troubling and the Town should require mandatory yearly training to prevent racially insensitive events like this in the future.  *Id.*  The Plaintiff testified at his deposition that an attendee (not a Board member or Town official) at this meeting, who was also a friend of Mr. Swimmer, suggested terminating Plaintiff's employment for being a whistleblower.  *See* Docket No. 107, Ex. 1, p. 20.  Additionally, the Plaintiff provided a recording of at least a portion of this meeting, during the time when Mr. Wright's report was received and the Board opened the floor up for questioning Mr. Wright about his report.  At that time, several attendees expressed dissatisfaction that Mr. Swimmer and Mr. McLean's employment had been terminated and asked about termination of the Plaintiff's employment because he had released the recording to the media and did not "follow the chain of command."  See Docket No. 107, Ex. 8.  It appears from the recording that the citizens were concerned about the media attention and the loss of jobs of the two men who made racist statements, but not concerned that the statements had been made.  Citizens had to be instructed several times to redirect comments and questions to Mr. Wright and the content of his report rather than problems they had with the Plaintiff.  *Id.*

On April 3, 2018, the Town of Warner held a meeting which included an agenda item related to the Defendant and possible disciplinary action related to the use of Town gravel, equipment, and wages.  The Agenda item read:

6:18-cv-00403-SPS     Document 110     Filed in ED/OK on 02/26/21     Page 6 of 25

> Discussion/Action on driveways that were put in by Michael Wittmer using Town of Warner gravel, Town of Warner Equipment and wages paid by the Town of Warner. Please decide[] disciplinary action; up to and/or including termination. Please advise whether to report to applicable authorities. Please decide whether to seek reimbursement from Mr. Wittmer for the cost of each driveway.

Docket No. 98, Ex. 2, p.4. At this meeting, the Board of Trustees went into executive session, then returned to publicly vote to terminate the Plaintiff's employment with the Town of Warner. The motion was passed, and the Plaintiff's employment was terminated that evening. *Id.*

## ANALYSIS

The Defendants contend that they are entitled to summary judgment on all four causes of action in this case. The Court disagrees with the Defendants as to Count I, but otherwise agrees with the Defendants as to Counts II-IV for the reasons stated below.

**First Amendment Retaliation Pursuant to § 1983.** The relevant law for this claim is evaluated under the *Garcetti/Pickering*[2] test, "[t]o achieve the required balance between the interests of public employees in commenting on matters of public concern and the interests of government employers in performing efficiently." *Bailey v. Indep. Sch. Dist. No. 69 of Canadian Cty. Oklahoma*, 896 F.3d 1176, 1181 (10th Cir. 2018). Using that test, the Court asks:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse

---

[2] *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Board of Education*, 391 U.S. 563 (1968).

-6-

employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Id.* (*quoting Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)).  "*In general*, the first three prongs are legal issues to be decided by the court and the last two prongs are factual issues left to the factfinder."  *Id* (emphasis added)*.*

Applying the *Garcetti/Pickering* analysis, the Court will address each of the five prongs in turn.  As to the first prong, "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  As a result, "the ultimate question in determining whether speech falls within an employee's official duties is 'whether the employee speaks as a citizen or instead as a government employee,'" *Rohrbough v. Univ. of Colorado Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010) (*quoting Brammer–Hoelter v. Twin Peaks Charter Academy,* 492 F.3d 1192, 1203 (10th Cir. 2007).  But there is "[n]o bright-line rule [that] governs when employees are speaking as part of their official duties."  *Lincoln v. Maketa*, 880 F.3d 533, 538 (10th Cir. 2018).  Rather, this analysis is to be done on "a case-by-case approach, looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties."  *Rohrbough*, 596 F.3d at 746*.*  The Tenth Circuit has noted, however, that protected activities include "communicating with newspapers or [] legislators or performing some similar activity afforded citizens[.]" *Green v. Bd. of Cty. Comm'rs*, 472 F.3d 794, 800 (10th Cir. 2007).

In applying the first prong, the Court thus asks "whether the speech 'stemmed from and [was of] the type . . . that [the employee] was paid to do.'" *Lincoln*, 880 F.3d at 538 (*quoting Rohrbough*, 596 F.3d at 746 (quotation omitted)). "A significant consideration is whether the audience of the employee's speech includes persons outside the employee's organization." *Vercos v. Bd. of Cty. Commissioners for Cty. of El Paso*, 259 F. Supp. 3d 1169, 1174 (D. Colo. 2017). Here, the Court finds that Plaintiff's speech—the release of the recording to news media—was not related to the work he was paid to do and therefore not part of his official duties.

The Plaintiff's testimony is that he worked in the Street Department and occasionally in the Water Department for the Town of Warner, and it appears undisputed that this job involved no communication with the media. *Sanchez v. Albuquerque Pub. Sch. Sys.*, 2007 WL 9734842, at *8 (D.N.M. Feb. 22, 2007) ("[T]he Court examines Plaintiff's 'job description, keeping in mind that inclusion of a job duty in a formal job description 'is neither necessary nor sufficient to demonstrate that [conduct] is within the scope of the employee's professional duties for First Amendment purposes.'") (*quoting Green*, 472 F.3d at 800) (*quoting Garcetti*, 547 U.S. at 425). In keeping the focus "on the specific nature of the plaintiff's job responsibilities[,]" *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 715 (10th Cir. 2010), the Court notes that even the Defendants acknowledge that the Plaintiff's job did not require him to discover or report misconduct to the media, and therefore finds that the Plaintiff's speech was not made pursuant to his official duties. *See Garcetti*, 547 U.S. at 423 ("[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First

-8-

Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government.").

Turning to the second prong, the Court examines whether the speech was a matter of public concern.  "Speech is a matter of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.' 'The inquiry turns on the 'content, form, and context' of the speech.'" *Klaassen v. Atkinson*, 348 F. Supp. 3d 1106, 1171 (D. Kan. 2018) (*quoting Lane v. Franks*, 573 U.S. 228, 241 (2014) and *Connick v. Myers*, 461 U.S. 138, 147-148 (1983)). Courts are instructed to consider "'the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest.'" *Brammer-Hoelter*, 492 F.3d at 1205 (*quoting Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000)).

The Defendants argue that the Plaintiff made the recording for the purpose of protecting his own job, not for any matter related to public interest.  But construing the facts most favorably to the Plaintiff, the Plaintiff contends that he had a different motive in recording the statements than he did in releasing them to the media.  While his motive for recording his co-workers was related to concerns about his own stability in his job, he asserts that he released the recording to the media for the express purpose of exposing the racism of employees in the Town of Warner.

But "[m]edia publicity of a dispute is not [alone] determinative of whether a public employee's speech was a matter of public concern." *Lancaster v. Indep. Sch. Dist. No. 5*,

149 F.3d 1228, 1233-1234 (10th Cir. 1998) (*citing Koch v. City of Hutchinson*, 847 F.2d 1436, 1448 (10th Cir. 1988) (*en banc*)). *See also Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012) ("[T]he fact that the incident mentioned in [plaintiff's speech] gained public interest does not mean that the [speech] itself was framed in a manner calculated to ignite that public interest."). "Instead, the correct analysis focuses 'on the extent to which the content of the employee speech was calculated to disclose wrongdoing or inefficiency or other malfeasance on the part of governmental officials in the conduct of their official duties.'" *Klaassen*, 348 F. Supp. 3d at 1173 (*quoting Lancaster*, 149 F.3d at 1234) (*quoting Koch*, 847 F.2d at 1445). "Statements revealing impropriety usually involve matters of public concern[,]" but "speech that simply airs grievances of a purely personal nature typically does not involve matters of public concern." *Brammer-Hoelter*, 492 F.3d at 1205 (internal quotation omitted). *See also Moore v. City of Wynnewood*, 57 F.3d 924, 932 (10th Cir. 1995) ("However, the mere fact of Moore's statements related to a general grievance he had with Boucher of Chief Sanders does not transform the statements into a matter solely of internal significance."). Although the Defendants attempt to construe the recording as a personal grievance between the Plaintiff and Mr. Swimmer, as well as an attempt to protect his own job, the Court has no trouble concluding that a recording exposing the racial bias of city employees is "inherently" a matter of public concern. *Connick*, 461 U.S. at 148 n.8 ("[The] right to protest racial discrimination [is] a matter inherently of public concern[.]").

Turning to the third prong, the Court must determine whether the government's interests in an efficient workplace are sufficient to outweigh the Plaintiff's right to free

speech. "Arguably, 'the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships.'" *Brammer-Hoelter*, 492 F.3d at 1207 (*quoting Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989) (emphasis in original)). This places the burden on the employer to justify the regulation of the speech. *Id.* Furthermore, when there is a delay in employment action such as firing an employee, the Defendant must demonstrate actual disruption to justify terminating an employee. *See Kent v. Martin*, 252 F.3d 1141, 1144 (10th Cir. 2001) ("Kent argues that evidence of '*actual disruption*' is required to justify an employee's termination several months after the protected speech occurred. [] We agree."). Put another way, "the question is not whether the plaintiff's speech was accompanied by disruptive behavior or made in a disruptive manner, but whether the government's legitimate interests provide a sufficient justification for controlling the plaintiff's message." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1327 (10th Cir. 2008).

"Relevant considerations include 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Gardetto v. Mason*, 100 F.3d 803, 815 (10th Cir. 1996) (*quoting Rankin v. McPherson,* 483 U.S. 378, 388 (1987)). The Defendants assert that they did not fire the Plaintiff because of his release of the recording to the media—and therefore did not regulate his speech—but simultaneously contend that they lost the opportunity to first investigate

-11-

the incident because the Plaintiff took the recording directly to the media, that the Town received death threats and locked its doors to City Hall, and that the release undermined efficiency and the quality of services provided by the Town. *See Johnson v. City of Murray*, 909 F. Supp. 2d 1265, 1301 (D. Utah 2012) (interest in promoting efficiency outweighed First Amendment interests). However, the Defendants have pointed to no evidence to support these assertions. Indeed, the Town *was* able to conduct an investigation following the release of the recording and received the report on Mr. Wright's findings at the March 2018 Town Board meeting, so it appears the Town's ability to investigate was *not* impaired. *See Flanagan*, 890 F.2d at 1566 ("Arguably, the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, *by the speech itself*, of the public employer's *internal* operations and employment relationships. The record is devoid of evidence of actual, or potential, disruption of the department's internal operations—no discipline problems, no disharmony, no impact on close working relationships, and no performance problems by plaintiffs. Defendants' case revolves solely around evidence of the potential disruption of the department's *external* relationships and operations."). Indeed, the Defendants go out of their way to assert that the Plaintiff's alleged performance problems had nothing to do with the speech at issue.

It is true, though, that the Plaintiff's release of the recording to the media certainly impaired the ability of the Town to handle the racist statements of its employees away from the public eye. *But see Prager v. LaFaver*, 180 F.3d 1185, 1191 (10th Cir. 1999) ("Given that Mr. Prager's letters accused Mr. LaFaver of granting an illegal tax abatement, it is

unsurprising that it created office tensions; however, that in itself does not render Mr. Prager's speech unprotected."). The Court cannot say, however, that the Town's interest in regulating the speech with little (if any) evidence of actual governmental disruption outweighs the Plaintiff's right to free speech here. The Court therefore finds that Plaintiff's activity should be given substantial weight, and more importantly, that the government's interests did not outweigh the Plaintiff's free speech interests here.

Under the fourth *Garcetti/Pickering* prong, "[i]n order to establish his claim of retaliation, Mr. Thomas must also show that his speech was a 'substantial' or 'motivating' factor in the city's decision to terminate him." *Thomas*, 548 F.3d at 1327 (*citing Brammer–Hoelter,* 492 F.3d at 1203). This is a question of fact, not of law. Here, the Plaintiff has presented evidence that he released the recording to the media in January 2018, and that in March 2018 the Town of Warner heard the conclusions of the investigative report by Mr. Wright regarding the incident. At that March 2018 meeting, an *attendee* (and not a Board member or supervisor of the Plaintiff) at the March 2018 Town of Warner meeting told the Board that the Plaintiff should be fired for being a whistleblower. *See* Docket No. 107, Ex. 1, p. 20. Additionally, when Mr. Swimmer asked why he had been fired for his statements but the Plaintiff had not been fired for failing to follow the chain of command for reporting, Trustee Marcus Glisson[3] stated that the Plaintiff "would be taken care of in good time." Docket No. 107, Ex. 1, p. 17, 149:10-13 & Ex. 8 (Recording, March 19, 2018). However, Mr. Wright specifically stated at that meeting that the Plaintiff could not be punished for

---

[3] Mr. Glisson was originally named as a Defendant in this case, but Plaintiff filed a Stipulation of Dismissal with regard to all claims against him on February 12, 2020. Docket No. 84.

being a "whistleblower." The Plaintiff's employment was then terminated the following month at the April 2018 meeting, four months after his alleged protected activity but only one month after a Board meeting in which the Board heard citizens complaining about the Plaintiff's release of the recording to the media and asking why he was still employed by the Town. This creates a genuine issue of material fact as to whether the Plaintiff's release of the recording was at least one motivating factor in the Board's decision to terminate his employment. Although a reasonable jury might conclude that the Plaintiff was fired solely for the use of Town gravel for private citizens, the Court cannot say they would be forced to such a conclusion. *See Thomas*, 548 F.3d at 1327-1328.

Finally, the fifth prong asks whether the Defendants would have reached the same employment decision in the absence of the protected conduct. Here, neither of the parties have addressed this prong. Taking the evidence in the light most favorable to the Plaintiff, the Court nevertheless finds that a reasonable jury could disbelieve Defendant's assertion that they would have reached the decision to terminate the Plaintiff's employment in the absence of the release of the recordings to the media. Accordingly, the Court finds that the fifth prong of the *Garcetting/Pickering* test is satisfied. In sum, the Court finds that sufficient evidence exists to support each of the five elements of the *Garcetti/Pickering* test for a First Amendment violation, and summary judgment must therefore be denied on this basis.

**Qualified immunity.** Finally, as to the Plaintiff's § 1983 claim, the Individual Defendants—Trustees Thomason, Watson, Marshall, and Miller, as well as Town Clerk-Treasurer Lewis—assert that they are entitled to qualified immunity. "The doctrine of

qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant has asserted a qualified immunity defense, "the plaintiff must meet a strict two-part test" to establish "'(1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct[.]'" *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (*quoting Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009)). *See also Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011)) (same). The Individual Defendants contend that Plaintiff's termination by the Board was not a constitutional violation and that Defendant Lewis was not a decisionmaker. But as set forth above, the Court has already determined the Plaintiff's release of the recording was constitutionally protected and that it remains a jury question as to whether such release was the cause of his termination. The only remaining question, then, is whether the individual Defendants violated clearly established law. In the Tenth Circuit, "[i]t has long been established law [] that when a public employee speaks as a citizen on matters of public concern to outside entities despite the absence of any job-related reason to do so, the employer may not take retaliatory action." *Casey v. West Law Vegas Independent School Dist.*, 473 F.3d 1323, 1333-1334 (10th Cir. 2007). *See also Thomas*, 548 F.3d at 1328. Accordingly, the individual Defendants are not entitled to qualified immunity.

**Punitive Damages.** The Defendants contend that neither the Town of Warner nor the Individual Defendants are liable for punitive damages as to Plaintiff's § 1983 claim.

-15-

The Plaintiff agrees that the Town cannot be liable for punitive damages, but contends that there remains a question for the jury as to whether the Individual Defendants' actions were "motivated by evil motive or intent, or [involved] reckless or callous indifference to [his] federally protected rights[.]" *Smith v. Wade*, 461 U.S. 30, 56 (1983). To the extent Plaintiff continues to seek punitive damages against the Individual Defendants, the Court reserves ruling on this issue until trial.

**Title VII Claim, Retaliation.** "[T]o establish a prima facie case of Title VII retaliation, Plaintiff must show '(1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'" *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) (*quoting Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012)). Here, the first and third prongs appear to be at issue.

In a light most favorable to the Plaintiff, the evidence reflects that the Plaintiff potentially made an informal complaint to a previous supervisor in 2017, and that he had heard derogatory language used up to four times, including the previously-described media release in January 2018. "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]." *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (*citing Allen v. Denver Public Schools*, 928 F.2d 978, 985 (10th Cir. 1991) (abrogated on other grounds)). It is not clear that Plaintiff's one reported informal complaint in 2017 and his release of the recording to

the media qualify as protected activity under Title VII. *See Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) ("A plaintiff cannot meet this burden by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs. Instead, there must be a steady barrage of opprobrious racial comments.") (internal quotations omitted). However, the Court has no trouble concluding that the Plaintiff's termination was materially adverse.

But even assuming *arguendo* that the first two prongs are met, the Plaintiff's allegations nevertheless fail as to the requirement of a causal connection. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation[.]"). Although "[a] retaliatory motive may be inferred when an adverse action closely follows protected activity," the termination must be "*very closely* connected in time to the protected activity" or "the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (noting that "a one and one-half month period between protected activity and adverse action may, by itself, establish causation[,] but that "a three-month period, standing alone, is insufficient to establish causation.") (emphasis in original). The Plaintiff contends that the release of his recording in January 2018 was close in time to his termination in April 2018 and therefore sufficient to meet the but-for causation requirement, but this over-three-month gap is insufficient to establish causation. The Court further notes that temporal proximity is clearly not established as to the informal report made to his supervisor in 2017. As to both, "where a gap of three months or longer has occurred, a plaintiff must present other evidence—'more than mere speculation,

-17-

conjecture, or surmise'—to establish that [his] protected activity was a but-for cause of the adverse employment action." *Bekkem*, 915 F.3d at 1271 (*quoting Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (*quoting Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)). The Court is mindful of the arguments and evidence presented by the Plaintiff regarding the March 2018 Town Board meeting. However, other than the assertion of the over-three-month time frame between the release of the recording in January 2018 and his termination in April 2018, the Plaintiff has provided no evidence *as to his Title VII claim* that his release of the recording was the *"but-for" cause*[4] of his termination. Because the Plaintiff has failed to satisfy his burden of presentation of a prima facie case of retaliation under Title VII, the Defendants are entitled to summary judgment on this claim. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-274 (2001) ("The cases that accept mere temporal proximity must be 'very close.'") (*citing, inter alia, Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient)). *See also Tafoya v. Dean Foods Co.*, 2009 WL 2762738, at *3 (D. Colo. Aug. 26, 2009) ("In the absence of close temporal proximity or other allegations suggesting a causal connection between her 2005 protected conduct and her 2007 termination, Ms. Tafoya fails to state a claim for retaliation[.]").

**Tortious Interference.** The Plaintiff's third claim applies solely to Defendant Lewis, for tortious interference with his employment relationship with the Town of Warner. In the context of at-will employment, "Oklahoma recognizes tortious interference

---

[4] Notably, this "but-for" causation standard differs from the "substantial or motivating factor" standard for First Amendment retaliation.

with prospective economic advantage, as well as tortious interference with an actual contractual relationship." *Goff v. Hukill*, 2010 WL 2595785, at *7 (N.D. Okla. June 24, 2010), (*citing Gonzalez v. Sessom,* 2006 OK CIV APP 61, ¶ 16, 137 P.3d 1245, 1249; *McNickle v. Phillips Petroleum Co.,* 2001 OK CIV APP 54, ¶ 21, 23 P.3d 949, 953–954; *and Harman v. Okla. ex. rel. N. Okla. Bd. of Regents,* 2007 WL 1674205, at *3 (W.D. Okla. June 7, 2007) (unpublished) (concluding that "[a]lthough there apparently is no Oklahoma Supreme Court authority directly recognizing [a tortious interference with prospective economic advantage] claim in the at-will employment context . . . lower Oklahoma courts have recognized the cause of action without hesitation")). Furthermore, "an actual contract is not a requirement for recovery." *Goff*, 2010 WL 2595785, at *7. *See also Cooper v. Northwest Rogers County Fire Protection District*, 2017 WL 3710081, at *4-5 (N.D. Okla. Aug. 28, 2017) ("[T]he Oklahoma Court of Civil Appeals has held that an at-will contract of employment can form the basis for a malicious interference with a contractual relationship claim. The Court has found no decision of the Oklahoma Supreme Court to indicate that it would disagree with the Oklahoma Court of Civil Appeals on this issue. Moreover, several federal district courts have determined that an at-will employee may state a claim for malicious interference with a contractual relationship, relying on the decisions of the Oklahoma Court of Civil Appeals.") (internal citations omitted).

"The elements of a claim for [tortious] interference are: 1) interference with a business or contractual right; 2) malicious and wrongful interference that is neither justified, privileged, nor excusable; and 3) damage proximately sustained as a result of the interference." *Tuffy's, Inc. v. City of Oklahoma City*, 2009 OK 4, ¶¶ 14-15, 212 P.3d 1158,

1165 ("The terms 'malicious interference,' 'intentional  interference,' and 'tortious interference' with contract or business relations have been used interchangeably in Oklahoma jurisprudence, and do not designate distinct torts[.]") (internal citations omitted).  *See also Anderson v. Suiters*, 499 F.3d 1228, 1238 (10th Cir. 2007) (*citing Morrow Dev. Corp. v. Am. Bank & Trust*, 1994 OK 26, ¶ 10, 875 P.2d 411, 416) (same). "The element of malice, for malicious interference, is defined as an unreasonable and wrongful act done intentionally, without just cause or excuse. This element clearly requires a showing of bad faith." *Tuffy's*, 2009 OK 4, ¶ 14, 212 P.3d at 1165.

Although "[a] malicious interference claim 'is viable only if the interferor is not a party to the contract or business relationship[,]' and an employee's 'interference with [an employer's] contract will be privileged only when the interference is undertaken in good faith and for a bona fide organizational purpose.'" *Cooper*, 2017 WL 3710081, at *5, (*quoting Wilspec Tech. Inc. v. DunAn Holding Group, Co.*, 2009 OK 12, ¶ 15, 204 P.3d 69, 74) and *Martin v. Johnson*, 1998 OK 127, ¶ 31, 975 P.2d 889, 896).  Here, Defendant Lewis asserts that he was Plaintiff's supervisor which means he was a party to the business relationship/contract, and the Plaintiff therefore cannot maintain a tortious inference claim against him.  *See Voiles v. Santa Fe Minerals, Inc.*, 1996 OK 13, ¶ 18, 911 P.2d 1205, 1210 ("Simply, Hugoton cannot be liable for wrongfully interfering with a contract if it was acting in a representative capacity for a party to that contract.").  *See also Ray v. American Nat'l Bank & Trust Co*, 1994 OK 100, ¶ 15, 894 P.2d 1056, 1060 ("Bank, however, was at all times acting on behalf of Young.  Bank could not wrongfully interfere with a contract concerning which it was acting in a representative capacity for a party.  A cause of action

for wrongful interference with contract can arise only when one who is not a party to a contract interferes with that contract by convincing one of the contracting parties to breach its terms.").

The Plaintiff contends, however, that Defendant Lewis was acting in bad faith and not in the interest of the employer/principal, and he therefore argues that this leaves a material question of fact for the jury to determine. *See Martin*, 1998 OK 127, ¶ 32, 975 P.2d at 896-897 ("If an employee acts in bad faith and contrary to the interests of the employer in tampering with a third party's contract with the employer we can divine no reason that the employee should be exempt from a tort claim for interference with contract."). Defendant Lewis, however, argues that the Plaintiff has provided no evidence of his alleged bad faith, and the Court agrees that the Plaintiff has not pointed to any specific evidence to support this claim other than the allegation that he interfered with the contract. *See Wilson v. City of Tulsa*, 2004 OK CIV APP 44, ¶ 19, 91 P.3d 673 ("The officer's actions cannot be characterized as malicious or in bad faith based only on the fact of the interference with the contract. Here, the record is devoid of other evidence regarding Chief's behavior or intentions toward Wilson in this context or any other. There is, therefore, no legal basis for concluding that Chief operated outside the scope of his employment.") (*citing Martin*, 1998 OK 127, ¶ 33, 975 P.2d at 897). *See also Grillot v. Oklahoma ex rel. University of Oklahoma Board of Regents*, 2019 WL 3558183, at *4 (W.D. Okla. Aug. 5, 2019) ("This discussion in *Martin* makes clear that for the exception to the general rule to apply with the result that the tortious interference claim alleged in this action survives, the agent accused of tortious interference must have acted against the

interest of the principle *and* in furtherance of the agent's own, personal interest.  Moreover, to show that the agent was acting in his own interests requires more than a showing of bad faith; plaintiff must show that the agent was acting contrary to the business interest of his employer *and* in furtherance of the agent's own, personal interests.") (citations omitted) (emphasis in original).  As the Plaintiff has failed to produce evidence establishing a question of fact as to bad faith, summary judgment for Defendant Lewis is appropriate as to the Plaintiff's tortious interference claim.

**Wrongful Discharge (*Burk* tort).**  Finally, the Plaintiff has alleged the *Burk* tort of wrongful discharge as to all Defendants.  *See Burk v. K-Mart Corp.*, 1989 OK 22, 770 P.2d 24.  The *Burk* tort was created by the Oklahoma Supreme Court in recognition of "a cause of action for wrongful discharge in violation of public policy, creating an exception to its general rule of at-will employment." *Wilburn v. Mid-South Health Development, Inc.*, 343 F.3d 1274, 1277 (10th Cir. 2003).  This tort is "tightly circumscribed" and available when "an employee is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy." *Burk*, 1989 OK 22, ¶¶ 18-19, 770 P.2d at 29.  "A viable *Burk* claim must allege (1) an actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal." *Vasek v. Board of County Commissioners of Noble County*, 2008 OK 35, ¶ 14, 186 P.3d 928, 932 (citations omitted).

The Defendants here assert that the Plaintiff has failed to establish the elements of a *Burk* tort as to the Town, specifically because the Plaintiff cannot establish that he acted consistently with a clear and compelling public policy. Furthermore, the individual Defendants contend that there is no clear mandate of public policy supporting individual liability for retaliatory discharge. *See Hall v. YMCA of Greater Tulsa*, 2010 WL 2196554, at * 3 (N.D. Okla. May 26, 2010) ("This Court agrees with the Court in *Eapen* [*v. McMillan*, 2008 OK CIV APP 95, ¶ 10, 196 P.3d 995, 998] that the Oklahoma Supreme Court has consistently construed the class of cases applicable under *Burk* to be narrowly defined; therefore, this Court refuses to expand the liability imposed under *Burk* to individual Defendants."). The Plaintiff has failed to address the argument by the Individual Defendants as to the *Burk* tort and the Court agrees with the Individual Defendants that liability under *Burk* should not be expanded to include them. *See Shelton-Heppel v. Parker Pest Control, Inc.*, 2010 WL 2737130, at * 2 (W.D. Okla. July 12, 2010) ("The Court finds for reasons stated in *Eapen* and, most recently, Judge Payne in [*Hall*], that the *Burk* tort should not be extended to permit wrongful discharge suits against individual agents or officers of corporate employers."). Accordingly, the *Burk* tort as to the Individual Defendants is hereby dismissed.

As to the Town, the claimant's assertion of a public policy tort, as discussed in the Amended Complaint, is raised pursuant to Oklahoma Constitution, Art. 2, § 22, *see* Docket No. 67, p. 10, ¶ 40, which prohibits infringements upon the freedom of speech or expression similarly to the First Amendment. In response to the Defendant's summary judgment motion, however, Plaintiff's limited response appears to assert that the

compelling public policy at issue here is his opposition to racial discrimination. He contends that Oklahoma recognizes a compelling public policy in that the Oklahoma Supreme Court held that "'the employee who brings a common-law tort action for damages occasioned by either a racially motivated discharge or by one in retaliation for bringing a racial discrimination complaint states a state-law claim for tortious employment termination under *Burk*.'" *Kruchowski v. Weyerhauser Co.*, 2008 OK 105, ¶ 10, 202 P.3d 144, 148 (*quoting Tate v. Browning Ferris, Inc.*, 1992 OK 72, ¶ 19, 833 P.2d 1218, 1230-1231). But the Plaintiff has not alleged that he was discharged in retaliation for bringing a racial *discrimination* complaint nor has he identified what discriminatory practice *of the Town* that he has opposed; the factual basis for his claim is that he was discharged in retaliation for exposing racist slurs of Town *employees* to the media. Nowhere in his Amended Complaint has he raised a claim of retaliation based on a racial discrimination complaint pursuant to Oklahoma law, nor has he alleged the Town engaged in discriminatory conduct or had a discriminatory practice.

However, the Court finds that Oklahoma *does* recognize a public policy tort claim for wrongful discharge based upon the exercise of freedom of expression. And because this Court found, above, that factual issues remain as to the Plaintiff's First Amendment claim, such factual issues would likewise apply under these circumstances. But "*Vasek* and other recent cases have continued to limit the *Burk* tort claim to circumstances in which a plaintiff does not have an effective federal or state remedy to redress the harm alleged in the claim." *Underwood v. Bd. of Cnty. Comm'rs of Cnty. of Jefferson,* 611 F. Supp. 2d 1223, 1233 (W.D. Okla. 2009). Here, as in *Underwood*, the Plaintiff is seeking both a

federal (through § 1983) and state (through Art. 2, § 22) remedy for the same alleged harm, with no explanation as to how the federal remedy would be inadequate to address this harm or how they would warrant a "separate and distinct recovery." *Id*.[5]  Because "*Burk* and its progeny do not permit a double recovery," *Id*. (*citing Kruchowski*, 2008 OK 15, ¶ 33, 202 P.3d at 153-154), the Town is therefore likewise entitled to summary judgment as to the Plaintiff's *Burk* tort claim.  *Underwood*, 611 F. Supp. 2d at 1234 & n. 8 ("Phillips fails to present argument or authority which could warrant a separate and distinct recovery for all claims he asserts even if a *Burk* claim could properly be pursued.").

## CONCLUSION

In summary, the Court finds that the Defendants' Motion for Summary Judgment should be DENIED IN PART as to the Plaintiff's Count I, for First Amendment Retaliation, and otherwise GRANTED.  Accordingly, IT IS HEREBY ORDERED that the Defendants' Joint Motion for Summary Judgment and Brief in Support [Docket No. 98] is GRANTED as to Counts II (Retaliation in Violation of Title VII), III (Tortious Interference), and IV (Wrongful Discharge), but DENIED as to Count I (§ 1983 First Amendment Retaliation).

**DATED** this 26th day of February, 2021.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**

---

[5] The Court notes that this case, as in *Underwood*, 611 F. Supp. 2d at 1233 n.8, is distinguishable from claims based on status or classification, such as age, gender, disability, or race, for which the availability of remedies for a class of victims is not uniform or evenhanded and for which a *Burk* common law remedy would be available.  *See Kruchowski*, 2008 OK 15, 202 P.3d 144.